In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 15-3389 & 15-3392

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAJDI ODEH and QAIS HUSSEIN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Illinois.
No. 14-CR-30177 — **David R. Hendon**, *Judge.*

ARGUED MAY 20, 2016 — DECIDED AUGUST 10, 2016

Before FLAUM and MANION, *Circuit Judges*, and ALONSO, *District Judge.*[*]

MANION, *Circuit Judge*. Qais Hussein and Majdi Odeh ran two convenience stores in southern Illinois where they sold counterfeit goods and illegally traded cash or ineligible items

---

[*] Hon. Jorge L. Alonso, Northern District of Illinois, sitting by designation.

for food stamps. They also filed false tax returns on behalf of their businesses. They were eventually indicted in a four-count indictment and pleaded guilty to all counts. As part of the plea agreement, Hussein and Odeh waived their right to appeal their sentences so long as their sentences were within the advisory guideline range. The district court sentenced Hussein and Odeh each to a within-guidelines term of imprisonment of 85 months. Nonetheless, the defendants appeal, arguing the government breached the plea agreement by not recommending reductions for acceptance of responsibility, and not recommending a sentence at the low end of the range for Odeh. The defendants also attempt to challenge the loss calculation on appeal. However, because the defendants waived their right to appeal, we dismiss these appeals.

I.

Hussein and Odeh operated the Garden Grill Market, Inc. and Garden Grill Market, Inc. II (jointly, "Garden Grill"), which were both convenience stores located in southern Illinois. The stores were certified to accept "food stamps," which are now formally known as SNAP benefits (SNAP stands for supplemental nutrition assistance program). SNAP benefits are provided to recipients on Electronic Benefits Transfer ("EBT") cards known as "Link" cards. Link cards are used like debit cards to purchase eligible food. Stores certified to accept Link cards may not exchange the SNAP benefits for cash or for ineligible items such as tobacco, alcohol, pre-cooked foods, or cellular phones. Additionally, the Garden Grill participated as a vendor in the federal Women, Infant, and Children ("WIC") program. The WIC program issued vouchers to participants to purchase specific food items such as formula, eggs, or milk. The vouchers specified a dollar amount and the

food for which they could be used. Additionally, the vouchers were dated by the month of redemption and could not be used until that month.

Rather than complying with the terms of the SNAP and WIC programs, Garden Grill exchanged cash and ineligible items for SNAP benefits and WIC vouchers. Specifically, Garden Grill exchanged cash for the government payments at a rate of 50 or 60 cents on the dollar, or sold ineligible items such as tobacco products, synthetic marijuana, cellular phones, alcohol, and counterfeit consumer goods such as perfume and Coach purses. This foray into fraud was not Hussein's first: He was also involved with food-stamp fraud at the Bagel and Halal Deli operating out of New York.

In late 2010, the government began investigating Garden Grill for violating the terms of the SNAP and WIC programs. During the investigation, the government interviewed employees of Garden Grill, as well as recipients of SNAP benefits and WIC vouchers. According to SNAP and WIC beneficiaries, it was commonplace for them to sell their benefits for cash or to use them to purchase ineligible items at Garden Grill. Interviews of the employees confirmed these statements. Employees also noted that the defendants or family members would use the SNAP cards to make bulk purchases at Sam's Club or Aldi's. The government used "undercover cards," meaning cards which they tracked, and those confirmed sales at Sam's and Aldi's. Video surveillance of the stores likewise captured individuals identified as the defendants or their family members leaving those stores with bulk purchases. Additionally, the government watched seventeen days' worth of surveillance videos filmed in the Garden Grill locations. During this time, the SNAP and WIC exchanges were

going on night and day. The government identified some of
the customers selling their SNAP cards and interviewed those
individuals, but noted that it would be extremely difficult to
track every individual.

The investigation continued into July 2012 and, on July 19,
2012, the government obtained search warrants for the stores.
In executing the search warrant, officers recovered evidence
of the SNAP and WIC fraud, including receipts for SNAP
sales that included handwritten notations that employees
later identified as indicating the amount of cash exchanged
for the SNAP benefit. The government also recovered
"stacks" of blank WIC vouchers dated for subsequent
months. (Recall that WIC vouchers could only be used during
the month indicated.) On the day of the search alone, the gov-
ernment recovered blank WIC vouchers totaling approxi-
mately $8,000. The government also recovered counterfeit
Coach purses and perfumes during the search.

Following this multi-year investigation, a grand jury is-
sued a four-count indictment against Hussein and Odeh.
Count 1 charged the defendants with conspiracy to unlaw-
fully acquire food-stamp payments; Counts 2 and 3 charged
them with aiding and assisting in the filing of a false corporate
tax return; and Count 4 charged them with trafficking in
counterfeit goods.

Prior to trial, both defendants entered into plea agree-
ments in which they pleaded guilty to all four counts and ad-
mitted that the government's loss exceeded $1,000,000. In the
plea agreements, the government agreed to recommend re-
ductions for acceptance of responsibility, unless the defend-
ants subsequently acted inconsistently with acceptance of re-
sponsibility. The government also agreed to recommend that

Odeh be sentenced at the low end of the advisory guidelines range and that Hussein be sentenced within the advisory guidelines range. As part of the plea agreements, the defendants waived their right to challenge any aspect of their convictions or sentences unless the court imposed a sentence in excess of the advisory guidelines range. During the plea colloquy, the defendants swore that they understood and accepted the terms of their pleas. They also expressly stated that they understood they were giving up their rights to appeal their sentences.

About two weeks before sentencing, Odeh sought to withdraw his plea agreement. Rather than delay things more, the government agreed that it would allow Odeh to challenge the loss amount at sentencing, even though the plea agreement had precluded such an argument. The government and Odeh amended the plea agreement to allow him to challenge the loss amount, and Odeh then withdrew his motion to withdraw his plea agreement. Two days before sentencing, Hussein filed a motion to join in Odeh's objection to the loss amount. The district court viewed this motion as an objection to the loss amount calculated in the Presentence Investigation Report. ("PSR"). The government informed the district court that, by objecting to the loss amount, Hussein was breaching his plea agreement. Nonetheless, Hussein's attorney, along with Odeh's attorney, presented evidence challenging the loss amount. Specifically, the defendants presented three witnesses who calculated the loss using, among other things, financial information provided by the brothers. But during questioning, the defendants' witnesses testified that they had not been told the brothers bought supplies in bulk from Sam's and Aldi's with SNAP cards. Also, the defendants' experts

testified the defendants had told them of only two bank accounts, whereas the IRS knew of at least twenty bank accounts associated with the defendants. The district court found the defendants' position on the amount of loss was frivolous. The district court further held that the government had supported its loss calculation with evidence of the difference between the amount of SNAP and WIC sales redeemed from the government less the amount reported on their state tax returns as SNAP and WIC sales. This calculation put the loss at approximately $1.6 million, and the defendants were sentenced on the basis of this loss amount.

Following the presentation of evidence at the sentencing hearing, the government argued that Hussein should not receive a reduction for acceptance of responsibility. The government did not take a position on whether Odeh should receive such a reduction, saying it was "punting" on that issue. But after Odeh made a statement at sentencing deflecting his guilt and falsely blaming his employees, his lack of English proficiency, and his ignorance of American law for his conduct, the government argued that Odeh had also breached the plea agreement. For that reason, the government then recommended that Odeh be denied a reduction for acceptance of responsibility. The government also recommended that the district court sentence Odeh at the top end of the advisory guidelines range. The district court denied both Odeh and Hussein reductions for acceptance of responsibility, finding that, by making a frivolous argument about the loss amount, they had not accepted responsibility. Additionally, the district court noted that Hussein had challenged the loss amount, which was barred by his plea agreement and thus also indicative of not accepting responsibility. And the district court

found that Odeh had not accepted responsibility for his of-
fenses because he attempted to place blame for his conduct
elsewhere. The district court then sentenced Odeh to 85
months' imprisonment (the advisory guidelines range was 70
to 87 months) and also sentenced Hussein to 85 months' im-
prisonment (his range was 78 to 97 months). Odeh and Hus-
sein appeal their sentences.

## II.

On appeal, the government argues that this court should
dismiss Odeh and Hussein's appeals because the defendants
waived their rights to appeal their sentences unless their sen-
tences were outside the advisory guidelines range. Because
both defendants were sentenced within the advisory guide-
lines range, the government maintains that their appeals are
barred by the plea agreements. Odeh and Hussein respond
that they are entitled to appeal their sentences because the
government breached the plea agreements by not arguing for
acceptance of responsibility reductions, and by not recom-
mending Odeh for a sentence at the low end of the sentencing
range.

This court rejected this argument in *United States v. Hicks*,
129 F.3d 376 (7th Cir. 1997), and *United States v. Hare*, 269 F.3d
859 (7th Cir. 2001). In both *Hicks* and *Hare,* the respective de-
fendants pleaded guilty and in their plea agreements waived
their right to appeal. However, after the district court sen-
tenced them they appealed, arguing the government
breached the plea agreement. But neither Hicks nor Hare had
argued to the district court that the government breached the
plea agreement. As we explained in *Hare*, by agreeing to
waive his right to appeal, the defendant agreed to have a
claim of breach of the plea agreement "resolved by the district

court." *Hare*, 269 F.3d at 862. And where the claim was not presented to the district court, we dismissed the appeals on the basis of the defendants' appeal waivers. *Hicks*, 129 F.3d at 381; *Hare*, 269 F.3d at 863.

Similarly, in this case, Odeh and Hussein entered into a plea agreement in which they waived their rights to appeal, except in the event that they were sentenced outside the advisory guidelines range, which they were not. While they claim the prosecution violated the plea agreement by not recommending an acceptance of responsibility reduction, or recommending that Odeh be sentenced at the low end of the advisory guidelines range, they agreed to allow the district court to resolve the question of whether a breach occurred by agreeing to the appeal waiver. However, as in *Hicks* and *Hare*, the defendants never presented that argument to the district court. And their waiver of appeal bars them from having this court consider the question on appeal. *Hicks*, 129 F.3d at 381; *Hare*, 269 F.3d at 862; *see also United States v. Whitlow*, 287 F.3d 638 (7th Cir. 2002) (holding that a waiver of appellate rights precluded a defendant from arguing on appeal that the prosecution violated the plea agreement, and explaining "[w]aiver of appeal means that the final decision [concerning whether there was a breach of the plea agreement] will be made by one Article III judge rather than three Article III judges …").

Odeh and Hussein believe that *United States v. Navarro*, 817 F.3d 494 (7th Cir. 2016), compels a different outcome. In that case, Navarro had waived his right to appeal and also had not objected to the government's purported breach of the plea agreement. On appeal, this court reversed on plain-error principles, concluding that "Navarro's likely sentence" would have been lower but for the government's breach. *Id.*

at 501. Based on *Navarro*, the defendants maintain that this court should review for plain error.

The defendants' reliance on *Navarro* is misplaced. The plea agreement in *Navarro* gave the defendant "the right to challenge the reasonableness of the sentence [on appeal] if the [district] court imposed a sentence in excess of the applicable guidelines range." *Id.* at 497. In that case, the district court imposed a sentence outside the applicable guidelines range. Thus, under the terms of the plea agreement, Navarro was entitled to appeal. *Id.* at 498. Conversely, in this case, Odeh and Hussein were not sentenced outside the advisory guidelines range, and thus their plea agreements, which allowed for an appeal in that limited circumstance, do not allow for an appeal in this case. *See United States v. Smith*, 759 F.3d 702, 706 (7th Cir. 2014) ("When the defendant pursuant to the plea agreement has knowingly and voluntarily waived his appellate rights, and the terms of that waiver are express and unambiguous, we will enforce those terms.").

Moreover, even if we applied a plain-error standard, it would not benefit Odeh and Hussein. While the government did not recommend a reduction for acceptance of responsibility for the defendants and did not recommend that Odeh be sentenced at the low end of the advisory guidelines range, the government did not violate the terms of the plea agreement. Under the plea agreement, if the defendants took any act or position inconsistent with an acceptance of responsibility, the government was no longer required to recommend such a reduction, and any violation of the plea agreement would entitle the government to request the court to impose on the defendants any penalty allowed by law. Hussein acted inconsistent with an acceptance of responsibility by arguing that

the loss was around $332,000 because he had stipulated in the plea agreement that the loss exceeded at least $1,000,000.[1] And Odeh falsely blamed his employees, his lack of English proficiency, and his ignorance of American laws for his criminal conduct; this also was inconsistent with an acceptance of responsibility and in breach of his plea agreement.[2] Thus, under the terms of the plea agreement, the government was no longer required to recommend acceptance of responsibility reductions or that Odeh should be sentenced at the low end of the advisory guidelines range. As such, there was no error, much less plain error.

Finally, Odeh and Hussein attempt to challenge the district court's loss calculation. Such a challenge would also fail under plain-error review because Odeh and Hussein cannot show any error. The government presented evidence that the loss exceeded $1.6 million. The extent of loss is appalling, especially considering it stemmed from two small convenience stores in Illinois over a 19-month period. As the government

---

[1] Odeh also argued the loss was only $332,000, but the government had modified the plea agreement to allow Odeh to make that argument. The government posited at sentencing, though, that this modification did not allow Odeh to present what the district court found to be a frivolous argument. Nonetheless, the government did not argue against an acceptance of responsibility reduction on that basis.

[2] Odeh counters by arguing that the government breached the plea agreement first by falsely telling the district court that he had stipulated that the loss exceeded $1,000,000. In support of his position, though, Odeh quotes language from the government's argument at sentencing out of context. And the government, in fact, clarified to the district court that it had amended its plea agreement with Odeh, allowing Odeh to present evidence of the amount of loss. The evidence does not support Odeh's contention that the government breached the plea agreement.

acknowledged at the sentencing hearing, the programs are set up in a way that are arguably too lax and it could do better on oversight, but noted that that would mean delaying benefits. The government also acknowledged that the people who trade the benefits "violate the law—because of drugs or gambling or some other type of addiction … ." At oral argument, the government explained that it targets the stores rather than the recipients, though, so the needy are not deprived of food. Those efforts don't seem to be working: In this case, Hussein had previously been involved in food-stamp fraud in New York and, even after entering into the underlying plea agreement, the government discovered that Hussein had put in a $20,000 pizza oven at a convenience store that had SNAP authorization and had instructed an employee to continue to exchange SNAP benefits for cash. (Recall that cooked food is not an eligible item under SNAP or WIC.) The government's investigation also revealed that the defendants continued to illegally purchase WIC benefits because the process to be disqualified from WIC is independent and takes longer than canceling the SNAP benefits. Additionally, the agents explained that convenience stores were often set up with straw owners and SNAP and WIC authorizations were obtained using those names. The agencies, or maybe even Congress, will need to address these deficiencies. In the meantime, families and children are being deprived of the intended benefits and all we can do is determine the loss to the government.

Here, the government determined the defendants caused a loss of approximately $1.6 million. The government's witness calculated this dollar amount by subtracting the amount of SNAP and WIC sales the defendants had reported on state income tax forms from the amount of reimbursement they re-

ceived under the SNAP and WIC programs. While the defendants now claim that their state tax returns were not accurate, the district court could reasonably rely on those figures to determine that the loss exceeded $1.6 million. Accordingly, even applying a plain-error standard, the defendants fare no better.

## III.

Hussein and Odeh pleaded guilty to all counts in a four-count indictment and as part of the plea agreement, they agreed to waive their right to appeal their sentences unless they were sentenced above the advisory guideline ranges. They were not. Accordingly, we dismiss these appeals.